# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00846-COA

RANDALL COOPER, JR. A/K/A RANDALL            APPELLANT
COOPER A/K/A RANDALL CARL COOPER, JR.
A/K/A RANDALL C. COOPER, JR. A/K/A
RANDALL CARL COOPER

v.

STATE OF MISSISSIPPI                                APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2015 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| |     HUNTER N. AIKENS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| |     LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, FIRST-DEGREE MURDER, AND SENTENCED TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 03/28/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, WILSON AND GREENLEE, JJ.**

**WILSON, J., FOR THE COURT:**

¶1. Randall Cooper was indicted for murder after he shot Virgil Harris. At trial, eyewitnesses to the shooting testified, as did investigating law enforcement officers. The court instructed the jury on first-degree murder, second-degree murder, heat-of-passion

manslaughter, and self-defense. The jury found Cooper guilty of first-degree murder, and the court sentenced him to life imprisonment.

¶2. On appeal, Cooper argues that the circuit court erred by granting three of the State's jury instructions and by denying one of his proposed instructions. Cooper claims that the jury was not adequately instructed on the issue of self-defense and that the court's instructions on the concept of "deliberate design" and the relationship and differences between murder and manslaughter were confusing and misleading. Cooper also claims that the evidence was insufficient to convict him of first-degree murder and that the verdict was against the overwhelming weight of the evidence. He argues that the evidence established a reasonable doubt that he shot the victim in the heat of passion or in self-defense.

¶3. For the reasons that follow, Cooper's arguments are without merit. In addition, Cooper failed to object to the jury instructions that he challenges on appeal, so those issues are procedurally barred. Accordingly, we affirm Cooper's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶4. On December 19, 2013, Cooper, Vursha Lovelace, and Virgil Harris (Virgil) all attended a party at Lovelace's brother's apartment. When Lovelace arrived at the party, Cooper was one of a dozen or so guests present. Guests were drinking and shooting dice. Lovelace left the party briefly, and when she returned, Virgil had also arrived. Lovelace noticed that Virgil had a gun when she first saw him, although she did not see the gun when she saw him again later.

¶5. Lovelace later received a call from Tevin Harris (Harris), who asked her to come pick

2

him up.  Earlier in the night, Virgil had asked Lovelace for a ride, so she told him that she was leaving the party to get Harris and that she could drop him off.  Virgil told Lovelace that he wanted to go to Sanfield and gave her five dollars to drive him there.  Virgil sat in the front passenger seat of Lovelace's Monte Carlo.  Lovelace did not see a gun when Virgil got into the car.  As Lovelace and Virgil were about to leave, Cooper followed them outside and asked for a ride.  He got in the backseat behind Lovelace.  They drove to Harris's house to pick him up, and Harris sat in the back seat behind Virgil.  Harris later testified that he saw a .380-caliber handgun on Virgil's lap as he approached the Monte Carlo.  The four then continued to Sanfield to drop Virgil off.

¶6.    As they drove down the highway, Virgil became agitated and began "talking crazy."  Cooper told Virgil to calm down.  Virgil said he would slap Lovelace if she were not his brother's sister.  Virgil threatened to "burn" (i.e., shoot) everyone in the car.  Although they had not reached Sanfield, Virgil told Lovelace to pull over and let him out.  Lovelace pulled over, and as Virgil exited the car, he called everyone in the car "the B word."  Lovelace testified, "So when [Virgil] said that, Cooper leaned over [and] shot him one time."  Virgil fell to the ground, and Cooper leaned over him and continued shooting.  Lovelace put the car in park and ran to Virgil.  Cooper and Harris got out of the car as well.  Suddenly, Cooper and Harris jumped in the driver and passenger seats respectively, and Lovelace jumped in the backseat.  Cooper drove a block or two and stopped, and then he and Harris got out of the car and ran.  Lovelace returned to the scene.

¶7.    At trial, Lovelace testified to the above version of events.  She denied that she was

3

ever afraid while Virgil was "talking crazy," but she admitted that she was glad when he wanted to get out of the car. Though Lovelace initially testified that she did not tell the police that Virgil had said "take me to jail" or "I'll spray everyone in this car," she later admitted telling police that Virgil had made those statements. Lovelace also reiterated that she never saw Virgil's gun in the car.

¶8. Harris testified that he felt threatened by Virgil's statements in the car because he had seen Virgil's gun when he entered the car. Harris said that he had seen Virgil with the same black and chrome .380 previously. Harris acknowledged that he also saw Cooper's gun in his waistband, which added to his unease. Harris testified that he asked if Cooper and Virgil were "alright," and Cooper said, "Yeah, I'm cool, man." Virgil also said, "I'm good." Harris claimed that there was a disagreement about money, which may have caused Virgil to start "talking crazy." Much of Harris's testimony about Virgil's statements was vague and difficult to follow, but he did testify that Virgil said he was going to "burn somebody" or "burn" everyone in the car. He also testified that Virgil told Cooper that he (Virgil) had a gun and was cursing everyone in the car. Finally, Virgil demanded to be let out of the car.

¶9. Harris said that as Lovelace stopped the Monte Carlo in the middle of the street, Virgil opened the door and then stopped as he was exiting. He turned around, pointed at Harris, and said, "If you are going to ride with them, you can get it too." He then looked at Lovelace, "flinched" at her, and threatened to slap her. Harris said that Virgil then turned as if to get out of the car, grabbed the gun from his lap with his left hand, had his right hand on his sagging pants, and then Cooper suddenly fired one shot. Virgil fell, and Cooper fired several

4

more times. Harris said this happened very quickly. Harris also claimed to see Virgil's .380 on the ground near his body. Though Harris maintained that he saw a gun in Virgil's lap, he admitted that he never saw Virgil point the gun at anyone in the vehicle.

¶10. Linda Ingram, who lived near the crime scene, was resting on her couch when she heard gunshots. She testified that she heard one shot, then a pause, then several more shots. She ran outside and saw Virgil in the street. No one else was present, but a police officer soon arrived. Ingram's cousin, Joshua Jackson, was sleeping on her porch. He also heard one shot, a pause, then several shots. Though he did not see the actual shooting, he saw one man get into the Monte Carlo and drive away.

¶11. Officer Oscar Lewis of the Columbus Police Department responded to an emergency dispatch and arrived on the scene within minutes of the shooting. He found Jackson kneeling over Virgil and pleading for help. After paramedics and other officers arrived, Lewis photographed the scene. Lewis observed shattered glass, shell casings, and blood, but he did not find a gun at the scene.

¶12. Austin Shepard of the Columbus Police Department crime lab testified about the evidence he collected from the scene. He collected six shell casings and three projectiles near Virgil's body. He noted that the Monte Carlo's front passenger window was broken, and he found one shell casing on the back passenger seat.

¶13. The day after the shooting, two employees of Golden Triangle Waste Services found a .40-caliber Smith & Wesson handgun in the bottom of a trash can near the crime scene. One of the men took it home, but when they discovered that it might have been used in the

5

shooting, they turned the gun over to the Columbus Police Department.

¶14. Investigator Chris Van Houten collected two projectiles from Virgil's body at Baptist Memorial Hospital. One was underneath Virgil's body, and the other was embedded in his clothing. Van Houten later attended Virgil's autopsy and collected four .380 rounds and a brown bag containing a bottle of unknown liquid from Virgil's effects.

¶15. Tommy Bishop, a forensic scientist at the Mississippi Crime Laboratory, testified as an expert in firearm identification. Bishop concluded that all of the casings and projectiles collected at the scene or during the autopsy were fired from the .40-caliber Smith & Wesson recovered from the nearby trash can.

¶16. Brent Davis from the State Medical Examiner's Office performed Virgil's autopsy. Davis found two bullet entry wounds to the right side of Virgil's neck and six entry wounds to the left side of Virgil's torso. All entry wounds had a corresponding exit wound except for one wound to the left torso. A bullet was found lodged in the right side of Virgil's chest.

¶17. At the conclusion of the evidence, the jury was instructed on first-degree murder, second-degree murder, heat-of-passion manslaughter, and self-defense. The jury found Cooper guilty of first-degree murder. The circuit judge sentenced Cooper to life imprisonment, as required by law. Cooper filed a motion for a new trial or judgment notwithstanding the verdict, which was denied, and then a timely notice of appeal.

¶18. On appeal, Cooper argues that the circuit court judge committed reversible error by denying one of his proposed jury instructions on self-defense and by giving three instructions requested by the State. He also argues that the evidence was insufficient to support the

verdict or that the verdict was against the overwhelming weight of the evidence. We find no error and therefore affirm Cooper's conviction and sentence.

## ANALYSIS

### I. Jury Instructions

¶19. Cooper argues that the circuit court erred by refusing instruction D-3 and by granting instructions S-6B, S-3B, and S-5B. We review the grant or denial of jury instructions for an abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). The instructions must be read as a whole, and if all instructions "fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Crook v. State*, 105 So. 3d 353, 358 (¶13) (Miss. Ct. App. 2012) (quoting *Davis v. State*, 18 So. 3d 842, 847 (¶14) (Miss. 2009)). In cases involving homicide, the defendant has a right to instruct the jury about his "theories of defense, justification, or excuse . . . , no matter how meager or unlikely." *Evans v. State*, 797 So. 2d 811, 815 (¶11) (Miss. 2000) (quoting *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995)). While a defendant is entitled to jury instructions that present his theory of the case, an instruction may be improper if it incorrectly states the law, is redundant, or lacks foundation in the evidence presented. *Crook*, 105 So. 3d at 358 (¶13) (citing *Davis*, 18 So. 3d at 847 (¶15)).

### A. Instruction D-3

¶20. Cooper's proposed instruction D-3 read:

> The Court instructs the jury that you are not to judge the actions of Randall Cooper, Jr., in the cool, calm light of after-developed facts, but instead you are to judge his actions in the light of the circumstances confronting Randall Cooper, Jr., at the time, as you believe from the evidence that those

circumstances reasonably appeared to him on that occasion; and if you believe that under those circumstances it reasonably appeared to Randall Cooper, Jr., at that instant that he took up a weapon, that Randall Cooper, Jr., then and there had reasonable ground to apprehend a design on the part of the deceased to kill Randall Cooper, Jr., or to do Randall Cooper, Jr., some great personal injury, and there reasonably appeared to Randall Cooper, Jr., to be imminent danger of such designs being accomplished[]; that Randall Cooper, Jr., was justified in anticipating an attack and using reasonable means to defend such attack; then you must find Randall Cooper, Jr., not guilty of the murder of the deceased.

The trial judge refused the instruction after concluding that it was "not a correct statement of the law."

¶21. Cooper argues that the judge abused his discretion by refusing D-3 because it is nearly identical to the instruction that the Mississippi Supreme Court approved in *Maye v. State*, 49 So. 3d 1124, 1131-32 (¶¶16-18) (Miss. 2010). In *Maye*, the Supreme Court held that the trial court abused its discretion by refusing essentially the same instruction.[1] *Id.* at 1132 (¶18). The Court stated: "Maye's theory of the case was self-defense, which was supported by

___

[1] Maye's proposed instruction D-8 read:

The Court instructs the jury that you are not to judge the actions of Cory J. Maye in the cool, calm light of after-developed facts, but instead you are to judge his actions in the light of the circumstances confronting Cory J. Maye at the time, as you believe from the evidence that those circumstances reasonably appeared to him on that occasion; and if you believe that under those circumstances it reasonably appeared to Cory J. Maye, at the instant that he took up a weapon, that Cory J. Maye then and there had reasonable ground to apprehend a design on the part of Ron Jones to kill Cory J. Maye or his daughter or to do Cory J. Maye and his daughter some great personal injury, and there reasonably appeared to Cory J. Maye to be imminent danger of such designs being accomplished; then Cory J. Maye was justified in anticipating an attack and using reasonable means to defend such attack; then you must find Cory J. Maye not guilty of the murder of Ron Jones.

*Maye*, 49 So. 3d at 1131 (¶16).

some evidence. Instruction D-8 was a correct statement of the law regarding how the jury should have interpreted Maye's actions, and it properly would have extended Maye's self-defense claim to include his asserted claim of defense . . . ." *Id.*

¶22. But subsequently in *Crook*, this Court concluded that

> the [S]upreme [C]ourt in *Maye* did not hold or in any way intimate that an instruction mirroring [Maye's proposed instruction D-8] must be routinely given in every case where self-defense is raised. Instead, a split [S]upreme [C]ourt reversed Corey Maye's murder conviction because the . . . jury instructions [that were given] did "not fully define self-defense *as applied to the facts of [that] case*." Indeed, the [S]upreme [C]ourt in *Maye* mentioned the fact-specific nature of its decision on the excluded jury instruction, not once but twice . . . .

*Crook,* 105 So. 3d at 361 (¶20) (quoting *Maye*, 49 So. 3d at 1130 (¶10)); *see also Maye*, 49 So. 3d at 1131 (¶15) (finding that the self-defense instructions given "did not go far enough *in this case*" (emphasis added)).

¶23. In *Crook*, we observed that, "[w]ithout question, *Maye*'s facts [were] certainly unusual": "Maye shot a police officer who was executing a lawful search warrant at Maye's residence," and his defense was that "he *mistakenly* believed the officer to be an intruder." *Crook*, 105 So. 3d at 361 (¶21). We concluded that the facts in *Crook* were "vastly" different from *Maye*. *Id.* at (¶22). Crook claimed that he drew a box-cutter in self-defense during a fistfight with his girlfriend's cousin and then accidentally stabbed the man as they struggled. *Id.* Unlike *Maye*, Crook's defense did not involve any "misapprehension or mistaken belief later brought to light by 'after[-]developed facts.'" *Id.* This Court held that for such a "routine self-defense . . . claim" that did not involve any "after-developed facts," a standard

"*Robinson* instruction,"[2] as modified by *Reddix v. State*,[3] was a complete and adequate statement of the law on self-defense. *Crook*, 105 So. 3d at 362 (¶23). Accordingly, we held that it was not an abuse of discretion for the trial judge to refuse an additional instruction that mirrored Cooper's proposed instruction D-3. *Id.*[4]

¶24. This case is controlled by this Court's decision in *Crook*. Like in *Crook*—and unlike in *Maye*—Cooper's claim of self-defense did not implicate any after-developed facts, misapprehension, or mistaken belief. Harris testified that Virgil had his gun out on his lap, while Lovelace testified that she did not see the gun during the car ride. But whether Virgil

---

[2] In *Robinson v. State*, the Supreme Court recommended the following self-defense instruction:

> The court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts.

*Robinson v. State*, 434 So. 2d 206, 207 (Miss. 1983), *overruled on other grounds by Flowers v. State*, 473 So. 2d 164, 165 (Miss. 1985).

[3] In *Reddix v. State*, 731 So. 2d 591, 594-95 (¶¶17-21) (Miss. 1999), the Supreme Court held that the jury must be instructed that it is bound to acquit the defendant if it finds that he acted in self-defense.

[4] *Crook* was a 6-4 decision of this Court. On November 15, 2012, the Mississippi Supreme Court granted Crook's petition for a writ of certiorari, with four justices voting to grant and five voting to deny. On January 17, 2013, the Court entered an order "find[ing] that there [was] no need for further review, and that the writ of certiorari should be dismissed." The order noted that only two justices disagreed, with one justice not participating. In addition, in *Brown v. State*, 194 So. 3d 139 (Miss. Ct. App. 2015), *cert. denied* 209 So. 3d 428 (Miss. 2016), we held, with little discussion, that the trial court in a murder case "properly refused" an essentially identical instruction. *Id.* at 145 (¶¶14-16).

10

displayed a gun is a *disputed* fact, not an after-developed fact. Instruction D-3 might have been necessary if there had been evidence that Virgil displayed what appeared to be a gun but turned out to be a harmless object. *See id.* at 361-62 (¶22). However, no such evidence was presented. Cooper advanced a "routine self-defense . . . claim" that was fairly and adequately addressed by standard self-defense instructions. *Id.* at 362 (¶23). Therefore, although instruction D-3 was an accurate statement of Mississippi law, the trial judge did not abuse his discretion by refusing to give it based on the facts of this case. *Id.*

### B. Instruction S-6B

¶25. The circuit court granted instruction S-6B, which read:

> The Court instructs the Jury that the phrase "heat of passion" refers to a sudden violent passion, which temporarily suspends or overthrows the judgment of the Defendant[;] however, this high degree of sudden and resentful feelings will not alone reduce an act of homicide committed under its influence to manslaughter. There must be such circumstances as would indicate that a normal mind would be roused to the extent that reason was overthrown, and that passion overtook the mind, thus destroying judgment. Therefore, if you find from the evidence in this case beyond a reasonable doubt that the Defendant, Randall Cooper, was induced by some insult, provocation, or injury which would naturally and instantly produce in the mind of a normal person a sudden impulse of violent passion; and further that in such state of mind, the Defendant shot Virgil Harris resulting in his death, then the shooting was done in the "heat of passion."

¶26. Cooper argues that this instruction confused the jury by implying that it was required to find beyond a reasonable doubt that he killed Virgil in the heat of passion before it could find him not guilty of first-degree murder. However, Cooper did not object to this instruction at trial; rather, his attorney affirmatively stated that he "accepted" it. Therefore, the issue is procedurally barred. *Holliman v. State*, 178 So. 3d 689, 700 (¶24) (Miss. 2015).

11

¶27. Moreover, the argument is without merit. Instructions must be read as a whole, not in isolation. *Milano v. State*, 790 So. 2d 179, 184 (¶14) (Miss. 2001). The circuit court first instructed the jury that in order to find Cooper guilty of first-degree murder, it had to find "beyond a reasonable doubt" that Cooper shot Virgil "with the deliberate design to effect death." The court then instructed that "'deliberate design' . . . means intent to kill without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime." Therefore, the court instructed the jury that it was the State's burden to prove beyond a reasonable doubt that Cooper acted with deliberate design, which included proof beyond a reasonable doubt that he did not act in the heat of passion. Instructions S-5B and S-6B then instructed the jury that in order to convict Cooper of heat-of-passion manslaughter, it would be required to find beyond a reasonable doubt that he shot Virgil in the heat of passion. This was a correct statement of the law.

### C. Instruction S-3B

¶28. Without objection, the circuit court gave instruction S-3B, which read:

> The Court instructs the Jury that the term "deliberate design" as used in these instructions means intent to kill without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime. The deliberate design to effect death cannot be formed at the very moment of the fatal act; however, the deliberate design to effect death need not exist in the mind of the Defendant for any definite period of time. If there is deliberate design, and it exists in the mind of the Defendant but for an instance [sic] before the fatal act, this is sufficient deliberate design to constitute the offense of First-Degree Murder.

Cooper did not object to this instruction at trial; rather, his attorney expressly stated that he "accepted" it. Accordingly, this issue is also procedurally barred. *Holliman*, 178 So. 3d at

700 (¶24).

¶29.	Moreover, the issue is without merit. Cooper now argues (1) that the instruction failed to inform the jury that an intentional killing could be manslaughter rather than first-degree murder; (2) that the instruction's "but for an instance [sic]" language was confusing and misleading; and (3) that the instruction impermissibly commented on the evidence.

¶30.	With respect to Cooper's first point, as noted above, the court specifically instructed the jury that if Cooper shot Virgil "under circumstances that would reduce the act to a lesser crime"—i.e., in the heat of passion—then he did not kill Virgil with "deliberate design." *See Wortham v. State*, 883 So. 2d 599, 604-05 (¶¶20-21) (Miss. Ct. App. 2004); *Brown v. State*, 768 So. 2d 312, 316-17 (¶16) (Miss. Ct. App. 1999). As to Cooper's second point, the Supreme Court has clearly and repeatedly upheld instructions that "deliberate design" may be formed "but for an instant before the fatal act." *See, e.g.*, *Roby v. State*, 183 So. 3d 857, 872-73 (¶¶64-66) (Miss. 2016); *Holliman*, 178 So. 3d at 700-01 (¶¶24-26); *Theodore v. State*, 798 So. 2d 465, 469-70 (¶¶19-24) (Miss. 2001); *Fears v. State*, 779 So. 2d 1125, 1127-28 (¶¶6-15) (Miss. 2000). Cooper's argument relies on a dissenting opinion. *See Fears*, 779 So. 2d at 1130-32 (¶¶25-30) (Waller, J., dissenting). As to Cooper's third criticism, the instruction does not comment on the evidence but merely defines the concept of deliberate design. In summary, the instruction was consistent with Mississippi Supreme Court precedent.

### D.	Instruction S-5B

¶31.	Cooper argues that the circuit court should not have given S-5B because it omitted an

13

essential element of heat-of-passion manslaughter.  The instruction read, in pertinent part:

> Heat of passion Manslaughter is distinguished from First-Degree Murder by the lack of malice and the presence of heat of passion. Therefore, if you find from the evidence in this case beyond a reasonable doubt that the Defendant, RANDALL COOPER, Jr., did on or about December 20, 2013, unlawfully, willfully and feloniously, kill Virgil Harris without malice aforethought and in the heat of passion, with a handgun, then you shall find the Defendant guilty of Manslaughter.

On appeal, Cooper argues that the instruction was incomplete because it failed to specify that heat-of-passion manslaughter was a killing "not in necessary self-defense." *See* Miss. Code Ann. § 97-3-35 (Supp. 2016).  Cooper speculates that this omission may have led the jury to infer "that self-defense was required in order to find Cooper guilty of manslaughter and not murder," which may have influenced the jury to convict him of murder.  However, Cooper did not object to this instruction at trial.  His attorney clearly stated that he had "no objection" to it.  Therefore, this argument is also procedurally barred.  *Holliman*, 178 So. 3d at 700 (¶24).

¶32.    Procedural bar notwithstanding, the omission was neither plain error[5] nor prejudicial.  The jury did not convict Cooper of manslaughter, so he does not contend that the omission requires reversal because it omitted an element of that offense.  Furthermore, we reiterate that jury instructions must be read as a whole, not in isolation.  *Milano*, 790 So. 2d at 184 (¶14).

_____

[5] We may notice "plain error" despite a defendant's failure to preserve the issue at trial.  The Supreme Court has explained that "[t]he plain[-]error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected.  Plain-error review is properly utilized for correcting *obvious* instances of injustice or misapplied law. . . . [I]n order to determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial."  *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (citations, quotation marks, and alterations omitted).

14

Instruction S-7B clearly instructed the jury that "[i]f the State ha[d] failed to prove beyond a reasonable doubt that [Cooper] did not act in self-defense," then the jury was required to find Cooper "not guilty." Read as a whole, the instructions cannot be interpreted to make self-defense an *element* of the crime of manslaughter. The potential for confusion that Cooper suggests simply is not present.

¶33.    As noted above, a defendant is entitled to fair instructions that adequately state the applicable rules of law. *Crook*, 105 So. 3d at 358 (¶13). The circuit judge fairly and adequately instructed the jury on the nature and elements of the charged offenses and Cooper's theory of defense. Therefore, we find no abuse of discretion in his giving of the challenged instructions or refusal of Cooper's proposed D-3.

## II.    Weight and Sufficiency of the Evidence

¶34.    Cooper argues that the evidence was insufficient to prove beyond a reasonable doubt that he shot Virgil with deliberate design or, alternatively, that the verdict was against the overwhelming weight of the evidence. We address these related issues together.

¶35.    When addressing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). The issue is not whether we would have found Cooper guilty based on the evidence presented at trial; rather, his conviction must be affirmed if there was sufficient evidence for "any rational trier of fact" to have returned a guilty verdict. *Id.*

15

¶36.    "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 844 (¶18).  The evidence should be "[v]iewed in the light most favorable to the verdict," and we will affirm unless "[t]he trial court . . . abuse[d] its discretion in denying a new trial." *Id.* at 845 (¶19).

¶37.    The State presented sufficient evidence for a "rational trier of fact" to have convicted Cooper, and the verdict was not against the overwhelming weight of the evidence.  To convict Cooper of first-degree murder, the State was required to prove beyond a reasonable doubt that he acted with deliberate design.  *See* Miss. Code Ann. § 97-3-19(1)(a) (Supp. 2016).  The State was also required to prove beyond a reasonable doubt that he did not act in necessary self-defense.  *Harris v. State*, 937 So. 2d 474, 481 (¶23) (Miss. Ct. App. 2006) (citing *Heidel v. State* 587 So. 2d 835, 843 (Miss. 1991)).

¶38.    Evidence at trial showed that Cooper shot Virgil eight times, once as he stood beside or stepped out of the car and seven more times as he lay on the street.  Witnesses described the shots as having a definite pause between the first shot and the final shot, not eight rapid-fire shots.  In addition, Lovelace never saw Virgil carrying or displaying a gun during the car ride, nor was a gun (other than Cooper's) ever recovered.  Virgil angrily cursed and possibly threatened others in the car, but witnesses did not agree on whether they even felt threatened by his behavior.  No one testified that Virgil ever pointed a gun at Cooper.  Virgil's words certainly do not require us to set aside the conviction.  In summary, the State's evidence was

16

sufficient for a rational trier of fact to find that Cooper shot Virgil with deliberate design, and no "overwhelming" evidence to the contrary was presented.

## CONCLUSION

¶39. The trial judge committed no abuse of discretion in his instructions to the jury, there was sufficient evidence to convict Cooper of first-degree murder, and the verdict was not contrary to the overwhelming weight of the evidence. Accordingly, we affirm.

¶40. **THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURT OF CONVICTION OF FIRST-DEGREE MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LOWNDES COUNTY.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR. BARNES, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND WESTBROOKS, J. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

**BARNES, J., SPECIALLY CONCURRING:**

¶41. While I concur with the majority's result, I write separately to express my disagreement with the majority's reliance on *Crook v. State*, 105 So. 3d 353 (Miss. Ct. App. 2012), in determining that the trial court's refusal of jury instruction D-3 was not an abuse of discretion. For the reasons stated in my dissent to that case, I find the *Crook* majority's holding – that *Maye v. State*, 49 So. 3d 1124 (Miss. 2010), is not applicable in instances where there is "no misapprehension or mistaken belief later brought to light by 'after developed facts'" – is not determinative as to whether such an instruction should be given. *Crook*, 105 So. 3d at 362 (¶22). Furthermore, as I noted in *Crook*, the principles announced

17

in jury instruction D-3 "have been a proper statement of the law in this State for over one hundred years." *Id.* at 367 (¶40) (Barnes, J., dissenting).[6]

¶42. However, while D-3 was a proper statement of the law, this Court "do[es] not look at jury instructions in a vacuum." *Williams v. State*, 803 So. 2d 1159, 1161 (¶7) (Miss. 2001). When read as a whole, if the jury instructions "fairly announce the law of the case and create no injustice, no reversible error will be found." *Johnson v. State*, 19 So. 3d 145, 146 (¶5) (Miss. Ct. App. 2009) (citation omitted). I find the trial court's refusal of jury instruction D-3 is harmless error in this instance based on the evidence produced at trial. While it was disputed whether Virgil possessed a firearm in the car, no gun was found on or around Virgil's body, and Harris testified that Virgil was turned to get out of the car when the first shot rang out. The evidence here was consistent and overwhelming that after Cooper fired the initial shot, hitting Virgil in the neck, he continued to shoot Virgil multiple times while Virgil was lying prone on the ground.[7] Lovelace said Cooper reached over the seat to shoot Virgil after the initial shot, and everyone testifying noted the pause between the initial shot and the successive barrage of shots. The forensic examiner testified that Virgil had eight gunshot wounds.

¶43. I find Cooper suffered no injustice from the trial court's refusal of jury instruction D-3, as I can see no basis for any reasonable juror's applying D-3 to find Cooper not guilty of

---

[6] The majority also acknowledges that "D-3 [is] an accurate statement of Mississippi law[.]"

[7] This is distinguishable from the facts of *Crook*, where the defendant claimed he accidentally stabbed the victim with a box cutter while he and the victim were fighting with one another.

murder. While D-3 may have been applicable had Cooper only fired the initial shot, the successive shots while Virgil was defenseless on the ground cannot be excused by any interpretation of D-3. Accordingly, I concur with the majority's decision to affirm the judgment of conviction.

**IRVING, P.J., AND WESTBROOKS, J., JOIN THIS OPINION.**